Page 1

```
 1           UNITED STATES BANKRUPTCY COURT.
              SOUTHERN DISTRICT OF FLORIDA
 2

 3    IN RE:                    CASE NO. 15-25340-JKO

 4    DELANOR AND ALOURDES ULYSSE,

 5         Debtors.
      _____/
 6

 7

 8              ECF #44, 50 and 62

 9                August 3, 2016

10         The above-entitled cause came on for hearing

11   before the Honorable JOHN K. OLSON, one of the Judges in

12   the UNITED STATES BANKRUPTCY COURT, in and for the

13   SOUTHERN DISTRICT OF FLORIDA, at 299 E. Broward Blvd.,

14   Fort Lauderdale, Broward County, Florida on August 3,

15   2016, commencing at or about 1:30 p.m., and the following

16   proceedings were had.

17

18

19

20

21

22          Transcribed from a digital recording by:
                 Cheryl L. Jenkins, RPR, RMR
23

24

25
```

```
 1
 2
 3                    APPEARANCES:
 4
                TERRY SCHWARTZ, Esquire
 5              On behalf of the Debtors
 6
                  JONES WALKER, by
 7              BARRY TURNER, Esquire
            On behalf of RES-FL Five, LLC
 8
 9              MATT GERARDI, Esquire
          On behalf of the Chapter 13 Trustee
10
11
                    ALSO PRESENT
12
      ECRO - Electronic Court Reporting Operator
13
14                  - - - - - - -
15
16
17
18
19
20
21
22
23
24
25
```

|   |   |
|---|---|
| 1 | THE COURT: All right. Let me take |
| 2 | appearances. |
| 3 | MR. TURNER: Thank you, your Honor. |
| 4 | Berry Turner, T-u-r-n-e-r, the law firm of |
| 5 | Jones Walker, on behalf of RES-FL Five, LLC, that's Five, |
| 6 | spelled out. |
| 7 | MS. SCHWARTZ: Good afternoon, your Honor. |
| 8 | Terry Schwartz for the debtors. |
| 9 | THE COURT: Thank you, Ms. Schwartz and |
| 10 | Mr. Turner. |
| 11 | All right. What's the fight here? |
| 12 | MR. TURNER: Judge, just to give you a |
| 13 | little background, the debtors filed bankruptcy I believe |
| 14 | in October last year, and we objected on two grounds, one, |
| 15 | that retirement payments were not allowed to be made at |
| 16 | all. Your Honor overruled that objection. |
| 17 | And the second is that the -- is 11 USC |
| 18 | 1325(a)(3) and (a)(7), that the plan was not filed in good |
| 19 | faith -- the petition was not filed in good faith and the |
| 20 | plan was filed in bad faith. |
| 21 | If you would like I can give an opening |
| 22 | statement. There is not a ton of -- luckily --- |
| 23 | THE COURT: Are there disputed facts? |
| 24 | MS. SCHWARTZ: The facts, your Honor, are |
| 25 | not disputed. |

Page 4

1        What the -- the main question from my
2   interpretation is the amount of monies that Mr. Ulysse
3   has, in fact, been taking out since 2011, evidence of
4   which has been supplied to counsel.
5            MR. TURNER:  And, Judge, if you're inclined,
6   I'll read through some of those facts, just to put them on
7   the record.
8            THE COURT:  Sure.
9            MR. TURNER:  The debtors' Schedule B,
10  Number 12, which is at Docket Entry Number 1, was three
11  retirement accounts, a 401-K in the amount of $26,289.32,
12  a 403-B in the amount of $4,908.79, and an IRA with
13  $13,061.60.
14           The debtor -- which is attached to my
15  objection, ECF Number 62, the debtor, in response to a
16  2004, provided documents that showed that in the last five
17  years they actually put $77,150 into their IRA.  So, there
18  is no explanation in the schedules of what happened to
19  that $24,000.
20           The debtor has filed their first amended
21  plan, Docket Entry Number 28.  The plan proposes $90
22  monthly payments for months one through four, and $115
23  (sic) monthly payments for months five through sixty.
24           THE COURT:  105?
25           MR. TURNER:  105.

1     There is another, a second amended plan that
2 was proposed, $90 months one through four and $209.95
3 months five though sixty.
4     So, just for totals, and my preliminary
5 statement, because I think that that really goes to the
6 heart of it, the debtors are paying unsecured creditors,
7 in my math, and I became a lawyer for a reason,
8 $12,117.20. In that same amount of time the debtors are
9 putting $114,000 into their retirement accounts.
10    On Schedule J it's just listed as one
11 payment, but if you look at the documents attached, and we
12 both have copies for your Honor, it looks like it says
13 TDA, which is usually an annuity, when it's listed on
14 payment stubs, and we have copies for your Honor if you'd
15 like to see, but those facts are not in dispute.
16    The cases cited by myself, including In Re:
17 Shelton, In Re: Shelton from the Northern District of
18 Georgia, In Re: Upton from the Southern District of Ohio,
19 state that good faith can be determined based on the
20 amount of payments and the amount of the debtor's surplus.
21    The debtor has been using this money, as
22 evidenced by the difference between Schedule B and the
23 last five years, not including whatever they put in before
24 the last five years that were not requested, and it's
25 inherently inequitable for them to save $115,000 when the

Page 6

1  payment to unsecured creditor is 12.
2              If that money ---
3              THE COURT:  Are you suggesting when you
4  mention that this has -- obviously money has been taken
5  out of the accounts because there previously was more, or
6  there was more put in than is there now, that these are
7  not qualified accounts, or is that a -- is there agreement
8  that these are qualified retirement accounts?
9              MR. TURNER:  These are qualified.
10             THE COURT:  Okay.
11             MR. TURNER:  There is no statement on that,
12 your Honor.  The statement is implying that they're using
13 the money for some reason, and if they're using the money,
14 then it's not retirement, they're not using it for its
15 purpose of retirement.
16             THE COURT:  Well, okay.
17             MR. TURNER:  And ---
18             THE COURT:  One of the questions that I
19 would logically get to is if the funds are being put in
20 but then taken out, is there a challenge by your client as
21 to whether these are, in fact, qualified retirement
22 accounts that are entitled to be treated as such in the
23 bankruptcy, or have they been used as "in and out
24 accounts" that may no longer be qualified?
25             MR. TURNER:  Judge ---

Page 7

1    THE COURT: That's a different question from
2    the one that I thought you were asking, which is to take a
3    totality of the circumstance Kitchens analysis of whether
4    it's fair in the circumstances for almost 10 times as much
5    to be saved in the next five years as paid to unsecured
6    creditors.
7    MS. SCHWARTZ: Your Honor, may I interrupt
8    for just one moment?
9    THE COURT: Sure.
10   MS. SCHWARTZ: I inadvertently did not give
11   you the evidence I would like to present.
12   THE COURT: All right. Why don't you ---
13   MS. SCHWARTZ: I do sincerely apologize.
14   THE COURT: Why don't you give it to
15   Mr. Brownell.
16   MS. SCHWARTZ: And just (inaudible) --
17   MR. TURNER: For ---
18   MS. SCHWARTZ: -- (inaudible) so you have it
19   handy.
20   MR. TURNER: Excuse me, I apologize.
21   For the record, we've agreed these
22   exhibits --
23   THE COURT: Okay.
24   MR. TURNER: -- are admissible, there is no
25   dispute.

Page 8

1  Judge, I don't want to make assumptions
2  about the debtors' age, but I believe that they're able to
3  -- I believe that they're over 65 and they're able to take
4  out the monies. So I don't believe that there is any
5  question about the qual ---
6  THE COURT: Fifty nine and a half is the ---
7  MR. TURNER: I apologize, your Honor. I
8  obviously have not gotten to that.
9  THE COURT: I'm somewhat more sensitive to
10  these things than some.
11  MR. TURNER: I have not gotten to that
12  question yet.
13  My purpose is that if there -- I think it
14  goes into the totality of the circumstances test, because
15  the retirement, in the totality of the circumstances in
16  this situation, needs to be reasonable considering the
17  unsecured payments, and if they're using them for
18  non-retirement reasons, then I think that there should be,
19  and is a negative inference towards them attempting to
20  save.
21  Also I'd like to state that in the last five
22  years, when I said earlier they saved 77,000, that's a
23  $50,000 difference of what they're ---
24  THE COURT: All right. In the last seven
25  years ---

1       MR. TURNER: The last five years,
2  your Honor.
3       THE COURT: Five years, saved, deposited
4  into these accounts ---
5       MR. TURNER: $77,150, and that's evidenced
6  by Exhibit 1 to our objection, Docket Entry Number 62.
7       If you add up all the year to dates, I
8  believe that's what you get, and if you -- just for the
9  record, in 2011 the debtors deposited 18,700. In 2012
10 they deposited 17,850. In 2013 they deposited 5,700. In
11 2014 they deposited 12,100, and in 2015, some of which
12 would have been postpetition, they deposited 22,800.
13      THE COURT: Okay.
14      MR. TURNER: And so, Judge, just looking at
15 the equities of the situation, I believe that it is
16 inherently inequitable to save this amount of money while
17 paying unsecured creditors next to nothing, and I
18 understand $12,000 is a lot of money, but it is not a lot
19 of money when put into the amount of -- amount that the
20 debtors are saving, and based on the fifty nine and a half
21 rule, can immediately then take out.
22      And I'm not challenging that they are
23 actually putting it in their account, but they should not
24 -- this type of behavior should not be rewarded in a
25 discharge of really solely my client, who is 99 percent of

1  the unsecured creditor class, and if debtors' counsel
2  calls the debtors as witnesses, I'd like an opportunity to
3  cross-examine them.
4              THE COURT: Of course. I haven't -- well,
5  Ms. Schwartz.
6              MS. SCHWARTZ: Your Honor, after review of
7  the objection, which was once again filed in this case to
8  confirmation, with all due respect to the Court, as well
9  as to opposing counsel, if anybody is making a bad faith
10 filing or a frivolous filing in this matter, it's my
11 opinion that, in fact, it's the creditor.
12             You had already ruled back in June that the
13 deductions made to the retirement, qualified retirement
14 funds are, in fact, exempt.
15             Well, even after you look at CMI, the
16 disposable income, and as we're all very well aware, our
17 plan is either going to be based, usually on disposable
18 income or liquidation test.
19             Disposable income, after the CMI, is only
20 showing $55 a month. Pursuant to the second amended plan,
21 the creditors are -- the debtors, I'm sorry, are obviously
22 paying more than that.
23             Mr. Ulysse is getting ready to retire. In
24 the interim he's taking care of a grandson, and the two of
25 them are dealing with health issues, some of which come

Page 11

1  with age, and some of which do not come with age.
2              He's been doing this since 2011, which was,
3  like I said before, evidenced by the checks that were
4  actually submitted.
5              According to the objection that was filed in
6  this case, it states that they're spending money on a
7  rental property. There is no rental property, your Honor.
8  It's a mausoleum. They have their homestead ---
9              THE COURT: I beg your pardon?
10             MS. SCHWARTZ: It's a mausoleum. It's not a
11 rental property. The objection states that it's an
12 investment property. It's a $5,000 mausoleum. That's
13 what's included.
14             There are no exorbitant expenses. If you
15 look at Schedule J, there are no exorbitant expenses. All
16 the expenses are reasonable and customary. They've all
17 been disclosed, as well as all of the income all being
18 disclosed.
19             They are strictly just trying to prepare for
20 retirement. Ms. Ulysse does not work. To be honest with
21 you, I don't even remember the -- I am not aware of when
22 the last time it was that she worked, but they're both
23 dealing with age, they're both dealing with medical. We
24 all know how expensive things are right now.
25             None of these monies that are being taken

1   out are used for anything that is not reasonable and
2   customary.
3                   MR. TURNER:  Judge, if I may?
4                   If we're talking about CMI, debtors' counsel
5   listed the 1,900 as an involuntary deduction on CMI, and
6   an annuity or retirement is not an involuntary deduction.
7                   On its face it is a voluntary deduction.
8   You can choose to save for retirement, or you cannot, and
9   such must be reasonable in light of payment of creditors.
10                  My client has a deficiency judgment.  If
11  they took $22,000 out of their -- out of their 401-K, out
12  of their retirement account, let's be clear, that's only
13  what they saved over the last five years.  There is no
14  evidence of what they saved previous before that.  They
15  didn't use that to pay my client.
16                  So they have been spending this money
17  without paying creditors, and I think that to allow this
18  type of behavior does -- the debtors want their fresh
19  start, and they want their retirement as well, and I don't
20  think that they're entitled to both.
21                  And should they be able to save for
22  retirement?  Yes, everybody should, but I think that the
23  Kitchens test, and the Court, recognize that everything
24  must be reasonable, and everything must be equitable, and
25  this is a Court of equity.

1   And, yes, I represent a business, and we had
2   a lot of jokes about hedge funds earlier, and I represent
3   some of them, and I make them as well, but the fact is
4   that all of that, as your Honor knows, trickles down, and
5   at some point my client just can't allow debtors to have
6   this amount of money without paying a pro rata
7   distribution.
8   So that's my argument, your Honor, without
9   further testimony.
10  THE COURT: Anything else, Ms. Schwartz?
11  MS. SCHWARTZ: Just as a quick response to
12  the deductions, as far as the involuntary, Mr. Ulysse's
13  employer does, in fact, require, if I am not mistaken, I
14  believe we already discussed this, I personally discussed
15  this with my client, that there is a requirement to take
16  out a 401-K.
17  As far as the monies being paid back, they
18  are paying to the best of their ability. They're
19  supporting not only themselves, but a grandchild as well.
20  True, not 100 percent, as far as daily living expenses for
21  the grandchild, but they're assisting their child in this
22  support. They're doing as best as they can.
23  A lot of this money, though, that was either
24  put into the pension, or taken out of, was, in fact, used
25  for this. It wasn't used for trips. It wasn't used for

1  anything like that. It was used strictly to supplement
2  their income.
3      THE COURT: I need to think about this one
4  because the argument that I heard earlier and overruled,
5  RES Five's objection to confirmation at ECF 44, the order
6  at ECF 54, was presented in a more abstract sense, or not
7  abstract, perhaps more granular, and this is asking me to
8  look at the totality of the circumstances. I've never
9  considered that question before, and so I think I need to
10 I think about it.
11     Mr. Gerardi, do you have any observations?
12     MR. GERARDI: Your Honor, some things came
13 out that I wasn't actually anticipating, just reading the
14 pleadings on their face.
15     To the extent that the debtors have
16 withdrawn money from a retirement account within six
17 months of filing, the trustee takes the position that that
18 must be listed as income on Form 1 of CMI.
19     If the debtors are using retirement income,
20 are withdrawing against their retirement going forward,
21 that would need to be listed on Schedule I as income going
22 forward, opening up a possible Lanning argument, change of
23 circumstances for the increase.
24     I don't have the schedules in front of me.
25 I was reviewing the docket, did not open the schedules,

Page 15

1  but if either of those circumstances take place, I believe
2  that the schedules can and should reflect whatever the
3  scenario is.
4         MS. SCHWARTZ:  I would like to clarify,
5  there has been no money recently taken out, I believe in
6  the past two and a half years.  So, no money was, in fact,
7  taken out of the pension.  It was taken out of the
8  paycheck to put into the retirement plan.
9         THE COURT:  Okay.
10         MS. SCHWARTZ:  Because that was specifically
11  addressed upon my conference with my clients.
12         MR. TURNER:  Judge, if I may?
13         The only reason, and I have no reason to
14  doubt Ms. Schwartz, is that there inherently would be more
15  money if money was taken out.  The account statement would
16  -- and the schedules -- either the schedules are wrong, or
17  money was taken out in some period of time, whether it was
18  in the last six months, or whether it was at a different
19  time.  I can't speak to that, and I'm not doubting that.
20         It's just, there would be inherently more
21  money in the account if it wasn't.  So I just disagree
22  with that statement, saying, oh, it could not have been
23  taken out.  It must have been taken out in the last five
24  years at some point, because it's not listed on Schedule
25  -- I believe Schedule B.  So I have no reason to doubt

```
1    Schedule B, so that at some point money was taken out of
2    the retirement account.
3              MS. SCHWARTZ:  Just to clarify, I did not
4    have any intention of claiming that nothing was ever taken
5    out.  It obviously was.
6              What I'm saying ---
7              THE COURT:  Okay.  When, when was it,
8    Ms. Schwartz?
9              MS. SCHWARTZ:  Over two and a half years
10   ago, I believe.  I don't have my actual file with me, but
11   that is what I recollect from my interview with my
12   clients.
13             THE COURT:  Okay.  Anything else I should
14   know?
15             (No verbal response.)
16             THE COURT:  Okay.  I'll read this stuff.  I
17   haven't -- this is a question that I haven't thought
18   though, and as you will appreciate, having sat here many
19   hours longer than perhaps you wished, I am no longer in a
20   position to think perfectly clearly this afternoon.
21             MS. SCHWARTZ:  Understood.
22             THE COURT:  So thank you very much.  It's an
23   interesting question.  I appreciate that for the Ulysses
24   it's a more than interesting question, but I have to look
25   at these things as the law presents them, and I haven't
```

```
 1   thought about that.
 2                So, thank you very much.
 3                MS. SCHWARTZ:  Thank you, sir.
 4                THE COURT:  Well presented and well argued.
 5                MS. SCHWARTZ:  Thank you.
 6                MR. TURNER:  Thank you, your Honor.
 7                THE COURT:  Thank you.
 8                MR. TURNER:  I'm going to find a court, one
 9   court in Florida to follow that Seford (phonetic) opinion.
10                THE COURT:  Well, have you been searching
11   for somebody to buy it?
12                MR. TURNER:  No, this was the first one that
13   I brought it to the attention.  The rest have pretty much
14   settled, but I'm sure I can convince one judge to agree
15   with me.
16                THE COURT:  You never know what you're going
17   to find.
18                MR. TURNER:  Yeah.  I mean, it's
19   interesting.  I don't -- you know, as a pure creditors'
20   attorney, I think we know where I stand, but ---
21                THE COURT:  Heartless bastard, that's the
22   deal.
23                (Laughter.)
24                MR. TURNER:  How are you Judge Olson?  It's
25   very good to see you.
```

Page 18

```
 1                    THE COURT:  Nice to see you, too.
 2               How are you?
 3                    MR. TURNER:  I'm good, I'm good.  I
 4     haven't ---
 5                    THE CLERK:  We'll go off the record.
 6                    MR. TURNER:  Yes, please.
 7                    THE COURT:  We are off the record.
 8                    MR. TURNER:  Yes, yes.
 9
10                    (Thereupon, the hearing was concluded.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1
 2
 3                        CERTIFICATION
 4
 5    STATE OF FLORIDA        :
 6    COUNTY OF MIAMI-DADE    :
 7
 8            I, Cheryl L. Jenkins, RPR, RMR, Shorthand
 9    Reporter and Notary Public in and for the State of Florida
10    at Large, do hereby certify that the foregoing proceedings
11    were transcribed by me from a digital recording held on
12    the date and from the place as stated in the caption
13    hereto on Page 1 to the best of my ability.
14            WITNESS my hand this 1st day of January,
15    2017.
16
17
18            _____
19            CHERYL L. JENKINS, RPR, RMR
20         Court Reporter and Notary Public
        in and for the State of Florida at Large
21              Commission #FF064003
                 December 27, 2017
22
23
24
25
```